IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NATASHA CULP,

      Plaintiff,

v.                                    Case No.  24-2274-JWB

SENTINEL REAL ESTATE CORP.,

      Defendant.

**MEMORANDUM DECISION**

Plaintiff Natasha Culp ("Plaintiff" or "Ms. Culp") brought this landlord-tenant action against Defendant Sentinel Real Estate Corporation ("Defendant" or "Sentinel").  She seeks damages for injuries she allegedly sustained as a result of Sentinel's failure to remediate water leaks and mold growth in her apartment.

On June 21, 2024, Plaintiff filed the instant lawsuit in this court.  (Doc. 1.)  Plaintiff filed a first amended complaint on June 25, 2024.  (Doc. 5.)  Defendant answered on October 11, 2024.  (Doc. 10.)  Plaintiff is a citizen of Kansas and Defendant is incorporated and has its principal place of business in New York.  (Doc. 5 at 1.)[1]  As the complaint plausibly alleged damages in excess of $75,000 this court has diversity jurisdiction through 28 U.S.C. 1332(a)(1).  (*Id.* at 2.)  The court presided over a bench trial from February 23-25, 2026, and took the matter under advisement.  (Docs. 97–99.)  The court has thoroughly considered the evidence and arguments presented at trial, the parties' post-trial submissions, the transcripts, and the relevant law, and makes the following findings of facts and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

---

[1] All citations to the record use the ECF-assigned pagination at the top of each document filed with the court.

For the reasons stated herein, the court directs the clerk to enter judgment for Plaintiff on counts I and II in the amount of $4,093.95, and enter judgment for Defendant on counts III, VI, and IX.

## I.  Findings of Fact

Plaintiff is a longtime Kansas resident.  (*See* Doc. 104 at 159–60.)  She is also a former resident of the Lexington Farms apartment complex in Overland Park, Kansas, which is owned and managed by Defendant.  (*Id.* at 160–61.)  Plaintiff first moved into these apartments at the end of 2019.  (*Id.* at 161.)  At the time Plaintiff moved in, the complex was owned by a different property management company.  (*Id.*)  When Plaintiff signed her lease, the agreement contained a "mold addendum."  (*Id.*)  The mold addendum required Plaintiff to report water leaks; Plaintiff did so.  (*Id.*)

Prior to Sentinel purchasing the property in May 2022, Plaintiff testified she had few maintenance issues and that any requests she did make were handled promptly.  (*Id.* at 161–62.)  This apparently changed after Sentinel purchased Lexington Farms.  (*Id.* at 162.)  Shortly after Sentinel's purchase of Lexington Farms, Plaintiff indeed experienced a slew of maintenance problems with water leaks and mold growth in her apartment.  (*See id.*)  Plaintiff first reported a water leak on June 26, 2022.  (*Id.* at 163.)  Because she did not have access to the new property management portal to make an electronic service request, Plaintiff left a note with the main office.  (*Id.* at 163–64.)  Defendant unclogged the drain line in the air handing unit in the apartment above Plaintiff and placed a fan outside of Plaintiff's apartment.  (*Id.* at 164; Def. Ex. 823.)

Plaintiff next reported a water leak on July 5 around 8:00 p.m.  (*Id.* at 171, 175–76.)  This leak came from Plaintiff's bedroom ceiling, specifically through her smoke detector.  (*Id.* at 171.)  Plaintiff had to place a bucket underneath the water "pouring out" of the detector.  (*Id.*)  Plaintiff

took a video with her phone to document the occurrence. (*Id.* at 172.) Plaintiff called the Defendant's emergency maintenance line but was unable to reach anyone. (*Id.*) She then called the fire department, sent an email to the apartment's main office, and put in a work order through the maintenance portal. (*Id.*) When the fire department arrived, they removed the smoke detector and again unclogged the air handling drain line in the apartment above Plaintiff's. (*Id.* at 174–75; Pl. Ex. 36.) To deal with the wet carpet that resulted, Defendant placed a fan in Plaintiff's bedroom. (*Id.* at 179.) Plaintiff's smoke detector was not replaced. (*Id.* at 180.)

After this event, Plaintiff testified that she told an employee of Defendant in the complex's main office that her apartment's "carpet was still getting wet occasionally, but that it was currently not wet." (*Id.* at 180–81.) The woman advised Plaintiff to call the office if the carpet got wet again. (*Id.* at 181.) Plaintiff also noted that at the end of July she received word that *her* apartment was leaking into the unit below. (*Id.* at 185.) Plaintiff's carpet got wet again on August 6. (*Id.* at 185.) At this time, she put in a maintenance request. (*Id.*) Plaintiff received an automated response that same day. (*Id.* at 186.) Plaintiff then put in an additional maintenance request. (*Id.*) In these maintenance requests, she noted that she had "new water spots" all over her ceiling and wall as well as mold around her door frame. (*Id.* at 187, 191.) A maintenance technician for Defendant came to perform work on August 9. (*Id.* at 188.) The maintenance technician deduced that the water was leaking again from the unit above Plaintiff. (Def. Ex. 808.) He unclogged the drain line again and recommended new paint for Plaintiff's ceiling when dry. (*Id.*) Additionally, Plaintiff's own air handling unit was now leaking into her apartment. (Def. Ex. 809.) The court has attached an image of some of the water stains Plaintiff indicated she saw on this date.



(Pl. Ex. 108.)  According to Plaintiff, Defendant's maintenance technician cut a hole in the

wall below Plaintiff's air handling unit on August 7, 2026.  (Doc. 104 at 197, 215.)  Plaintiff took

pictures of the space below the air handling unit which was now exposed.  (*Id.* at 212, 215.)



(Pl. Ex. 125.)  Plaintiff explained to the court that at the time of the above photos, the area below her air handling unit was "soaking wet."  (Doc. 104 at 216.)  Sometime after these photographs were taken, but before August 14, Defendant replaced Plaintiff's air handling unit drain line.  (*Id.* at 219–20.)  On August 9, Defendant's maintenance staff reported that there was "no active mold visible."  (*Id.* at 221; Def. Ex. 809.)

That same day, Plaintiff authored an email to Steve Nieglos, one of Sentinel's corporate vice presidents, to complain about the problems.  (*Id.* at 231–34.)  Mr. Neiglos both called and emailed Plaintiff stating that Sentinel was looking into the situation and would follow up.  (*Id.* at 233, 235.)  Plaintiff also spoke to Lori BeBout, a Sentinel manager.  (*Id.* at 234.)  From August 11 to 13, Plaintiff was out of town.  (*Id.* at 236.)  On August 13, 2022, Plaintiff decided to move out of her unit.  (*Id.* at 238–39.)  The same day, she reported another water leak in her apartment, as water was seeping out of the wall by her air handling unit.  (*Id.* at 239–40.)  She took a video of

this occurrence. (*Id.*) Sentinel responded the following day and could not find the leak. (*Id.* at 241–42.) On August 14, there was more water leaking, including "water bubbles" on the wall. (*Id.* at 243.) Work repairing this was reportedly completed on August 25, well after Plaintiff left her apartment. (*Id.* at 243–44; Def. Ex. 886.)

During this time, Plaintiff began to experience health concerns. (Doc. 104 at 253.) She testified that from June through August, she experienced "severe migraines" and "consistent headaches". (*Id.*) She also had "severe itchiness in my skin that would, like, leave bruises on my body from itching so bad." (*Id.* at 254.) Plaintiff testified that her doctor conducted bloodwork and that the results showed she did not have an allergy to mold. (*Id.* at 255–56.) But she testified that when she left the apartment complex, she "started to feel better." (*Id.* at 256.) Plaintiff admitted no medical provider ever "diagnosed" her with a "mold-related condition." (*Id.* at 267.) Plaintiff also admitted that she still suffered from headaches, nausea, and dizziness in 2024, two years after leaving Lexington Farms. (Doc. 105 at 7, 10–11.)

The parties each called expert witnesses. Plaintiff's very first witness was Defendant's expert Christopher Frey. (Doc. 104 at 5.) Mr. Frey has been an environmental consultant for 34 years. (*Id.* at 6.) He is a mold expert and operates APEX Environmental, a consulting business. (*Id.*) He has testified previously as an expert witness on mold. (*Id.*) Mr. Frey agrees that there was mold near the HVAC unit in Plaintiff's apartment. (*Id.* at 10.) Mr. Frey's investigator (as Mr. Frey did not do the inspection himself) recommended that the mold be "remediated". (*Id.*) The air sampling test done by APEX did not detect any abnormal amount of airborne mold in Plaintiff's apartment on the date of sampling, August 29, 2022. (*Id.* at 73, 87, 91–93; Def. Ex. 811.)

Plaintiff's expert witness was a non-retained expert, Jonathan Bonness. (Doc. 104 at 131.) Mr. Bonness is a mold inspector. (*Id.*) Mr. Bonness has performed several thousand mold

inspections in the last ten years.  (*Id.* at 131–32.)  He has previously testified on issues related to mold.  (*Id.*)  Mr. Bonness observed mold on the surface of sheetrock in Plaintiff's HVAC closet.  (*Id.* at 138.)  He took a sample of the mold from the sheetrock using a "tape lift method."  (*Id.* at 139.)  Mr. Bonness also testified that there was an odor of spray paint present where he took the sample.  (*Id.* at 140.)  This sample was mailed to a lab which sent Mr. Bonness the results.  (*Id.* at 140, 142.)  Mr. Bonness also recommended the mold be remediated.  (*Id.*)

Plaintiff also called Dr. Georgia Nab.  (Doc. 105 at 110.)  Dr. Nab is a chiropractor and functional medicine practitioner.  (*Id.*)  Dr. Nab possesses a master's degree in functional medicine and has several certifications.  (*Id.* at 110–11.)  Dr. Nab was permitted to testify in a limited manner under *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999), as to her observations of Ms. Culp.  (*Id.* at 121.)  Her testimony was sharply limited, however, as it quickly began to venture outside of those observations into the realm of a traditional expert witness, a role for which Dr. Nab was not properly qualified.  (*Id.* at 124–30.)  Additionally, Dr. Nab began seeing Plaintiff in August 2024, two years after the events of this case.  (*Id.* at 121.)  Because of her limited testimony and when she began seeing Plaintiff, Dr. Nab was unable to offer significant insight into Plaintiff's medical condition at the time of the events of this case.  (*See id.* at 127–30.)

## II.    Conclusions of Law

After review, the court concludes that Plaintiff has failed to prove her claims, save for one narrow violation of the Kansas Residential Landlord Tenant Act ("KRLTA") and consequent breach of contract.  The court organizes its analysis through each of the counts remaining in the case: (1) the KRLTA; (2) breach of contract; (3) negligence/premises liability; and (4) punitive damages.

### A.    Kansas Residential Landlord Tenant Act

7

The KRLTA—in relevant part—requires that:

(a) Except when prevented by an act of God, the failure of public utility services or other conditions beyond the landlord's control, the landlord shall:

> (1) Comply with the requirements of applicable building and housing codes materially affecting health and safety. If the duty imposed by this paragraph is greater than any duty imposed by any other paragraph of this subsection, the landlord's duty shall be determined in accordance with the provisions of this paragraph;

> (2) exercise reasonable care in the maintenance of the common areas;

> (3) maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and air-conditioning appliances including elevators, supplied or required to be supplied by such landlord;

> (4) except where provided by a governmental entity, provide and maintain on the grounds, for the common use by all tenants, appropriate receptacles and conveniences for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit and arrange for their removal; and

> (5) supply running water and reasonable amounts of hot water at all times and reasonable heat, unless the building that includes the dwelling units is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant and supplied by a direct public utility connection. Nothing in this section shall be construed as abrogating, limiting or otherwise affecting the obligation of a tenant to pay for any utility service in accordance with the provisions of the rental agreement. The landlord shall not interfere with or refuse to allow access or service to a tenant by a communication or cable television service duly franchised by a municipality.

K.S.A. § 58-2553(a)(1)–(5).  These requirements are collectively referred to as "habitabil[ity]" requirements and are nondelegable.  *Washburn South Apartments, L.L.C. v. Hession*, 570 P.3d 1268, 1274 (Kan. Ct. App. 2025); *see also Joe v. Spangler*, 631 P.2d 1243, 1244–45 (Kan. Ct. App. 1981).  The duties "must be incorporated into residential leases" and therefore the statute "constitutes a contract to repair[.]" *Jackson by Jackson v. Wood*, 726 P.2d 796, 800 (Kan. Ct. App. 1986).  The facts adduced at trial can only support claims under subsection 3 of the above, which requires a landlord to "maintain in good and safe working order and condition all electrical,

plumbing, sanitary, heating, ventilating and air-conditioning appliances including elevators, supplied or required to be supplied by such landlord[.]" K.S.A. § 58-2553(a)(3). Plaintiff proffered no information at trial or in post-trial briefing to support a claim based upon the violation of "building or housing codes". *Id.* at (a)(1) Likewise, there are no factual allegations concerning common areas, trash receptacles, or running water. *Id.* at (a)(2), (a)(4), (a)(5). This therefore rules out claims under subsections (1), (2), (4), and (5).

Once a landlord has breached a provision of the KRLTA, the Act confers upon the tenant two possible remedies: "terminating the rental agreement (K.S.A. 58-2559[a]) and recovering damages caused by the landlord's breach (K.S.A. 58-2559[b])." *Hession*, 570 P.3d at 1274. Termination of the rental agreement requires notice by the tenant to the landlord explaining the problem. K.S.A. § 58-2559(a)(1). Once notice is given, the landlord must "initiate[] a good faith effort to remedy the breach within fourteen (14) days after the receipt." *Id.* Should the landlord do so, the lease "shall not terminate." *Id.* Should a "same or similar" breach occur after the initial 14-day period, the tenant "may deliver a written notice to the landlord specifically describing the breach and stating that the rental agreement shall terminate upon a periodic rent-paying date not less than thirty (30) days after the receipt of such notice by the landlord." *Id.* Here, while Plaintiff did leave her apartment, she never provided such notice nor waited the 30 days to leave. Therefore, Plaintiff is not pursuing a remedy under subsection (a).

Subsection (b), however, provides for the recovery of damages and injunctive relief for noncompliance with the statute or the lease. *Id.* at § 58-2559(b). Recovery under subsection (b) "does not require the tenant to give notice and its availability is not dependent upon the landlord's lack of good faith." *Love v. Monarch Apartments*, 771 P.2d 79, 83 (Kan. Ct. App. 1989). Kansas courts have held that the "primary measure of damages . . . is the difference between the fair rental

9

value of [Plaintiff's] apartment as it should have been and the fair market value of the apartment as it actually was, insofar as the difference resulted from [Defendant's] breach of its statutory duties." *Id.* (modifications added).  Successful plaintiffs may also recover "consequential damages flowing from [Defendant's] breach if such damages may 'fairly be considered as arising, in the usual course of things, from the breach itself,' or 'may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach.'"  *Id.* (modifications added) (quoting *Kansas State Bank v. Overseas Motosport, Inc.*, 563 P.2d 414 (1977)); *see also Hession*, 570 P.3d at 1275.

The court has determined that Defendant breached KRLTA and Plaintiff is entitled to $4,093.95 in damages.  Looking at the court's findings of fact above, it is clear there are two possible independent violations of the KRLTA.  Only one succeeds.

### 1.  The Upstairs Leaks

First, Plaintiff complained about a water intrusion on June 26, 2022.  (Doc. 104 at 163–64.)  Water was leaking through her ceiling from the unit above hers.  (*Id.*)  Plaintiff disputes Defendant's characterization that they "promptly responded" and "addressed" the leak.  (Doc. 112 at 3–4.)  Moreover, Plaintiff contends that this leak from above "continued into July and August." (*Id.*)  But the evidence does not show that Plaintiff was continuously experiencing a leak from the upstairs unit between June 26, 2022, and August 2022.

Rather, as Defendant persuasively argues, the evidence shows that there was an acute leak on June 26, 2022.  (Doc. 104 at 164.)  Defendant fixed the leak above Plaintiff's unit no later than June 28, 2022, and provided a fan to dry the carpet in Plaintiff's unit.  (*Id.*; Def. Ex. 823.)  There was another acute leak from above Plaintiff, nine days after the first, on July 5, 2022.  (Doc. 104 at 171.)  The fire department was able to resolve the leak, and Defendant again provided a fan to

dry the carpet in Plaintiff's unit. (Pl. Ex. 36; Def. Ex. 883.) From this point forward, there is no evidence of another leak from above Plaintiff with the exception of Plaintiff's equivocal testimony that her carpet "was still getting wet occasionally, but that it was currently not wet" in mid-July of 2022. (Doc. 104 at 180–81.) When Plaintiff relayed this to Defendant, Defendant instructed Plaintiff to report if her carpet got wet again. (*Id.* at 181.) She did not do so until August 6, 2022. (*Id.* at 185.) As explained above, the leak from above Plaintiff was remedied by Sentinel maintenance with work beginning the following day and wrapping up no later than August 9. (*Id.* at 214–15; Doc. 105 at 75; Def. Exs. 808–09.) It is the leak from within Plaintiff's own apartment, also discovered on August 6, 2022, which as explained in the next section, is much more problematic.

Based upon these facts, liability under the KRLTA cannot attach to Defendant for the leaks from the unit directly above Plaintiff. The KRLTA, as the court previously explained, is "not a strict liability statute." (Doc. 106 at 12.) The statute plainly contemplates a reasonable opportunity for the landlord to cure. While this lawsuit, as explained above, does not directly involve the KRLTA's lease termination provision, that provision expressly envisions that prior to holding the landlord accountable for a failure of an appliance under K.S.A. § 58-2553, a landlord must have an opportunity to cure. K.S.A. § 58-2559(a)(1). Moreover, Kansas courts have instructed that a landlord is not "an insurer of good and safe working order of the appliances supplied by him." *Baer v. Fleenor*, 1987 Kan. App. LEXIS 871, at *6 (Kan. Ct. App. May 7, 1987) (unpublished). Even more explicitly, courts have stated that "*if* the landlord *knew or reasonably should have known* of a defective condition in the heating stove or ventilation, *then* the landlord owed a duty of reasonable care to *repair so as to maintain* the heating stove and ventilation in good and safe

11

working order and condition." *Jackson*, 726 P.2d at 800 (emphasis added). This clearly indicates that the landlord is afforded a reasonable opportunity to repair to comply with the law.

This interpretation comports with the text of the statute which requires that the landlord "maintain" the listed appliances. K.S.A. § 58-2553(a)(3). The use of the word "maintain" implicitly recognizes that household appliances and equipment are likely to experience failures and malfunctions. It is the landlord's duty to conduct routine maintenance and repair failures as they arise. Any other interpretation would transform the KRLTA into a strict liability statute where a landlord would be liable every time a covered appliance broke down, notwithstanding any prompt efforts to repair. For these reasons the court concludes that Defendant Sentinel reasonably responded to and repaired the three leaks that the evidence shows occurred above Plaintiff's unit. As a consequence, liability cannot attach to Defendant for these issues.

### 2. The Leak in Plaintiff's Unit

It is a different story when it comes to the leaks in Plaintiff's unit. The evidence produced at trial shows that Defendant's response left much to be desired. Towards the end of July, Plaintiff testified she received a call from maintenance informing her that her air handling unit was leaking into the unit below hers. (Doc. 104 at 185.) Defendant has admitted that Plaintiff's unit was leaking in June and July. (Pl. Ex. 307 at 3.)

Plaintiff finally made another complaint about a wet spot on the carpet in her bedroom on August 6, 2022. (Doc. 104 at 184.) After looking around further, Plaintiff made a second complaint that indicated she had found mold in her unit. (*Id.* at 191–92.) Moreover, she took pictures that indicated non-trivial water damage on the wall near her bedroom door, which is adjacent to the apartment's air handling unit. (*Id.* at 192–95.)

On August 7, 2022, Plaintiff sought options for leaving her unit. (Doc. 104 at 207–08, 211–12; Pl. Ex. 29.) When responding to these maintenance reports on August 7, 2022, Defendant found wet drywall in Plaintiff's apartment below the air handling unit. (Doc. 104 at 214.) Maintenance reported that they found water stains but no mold. (Def. Ex. 885.) Maintenance also cut a hole in the drywall below Plaintiff's air handling unit. (Doc. 104 at 214.) In the open space beneath the air handling unit there was visual evidence of significant water intrusion and some mold growth. (*Id.* at 41, 139–40, 216–17; Def. Ex. 885; Pl. Exs. 124–27.)

By August 13, Plaintiff had made the decision to move out. (Doc. 104 at 238–39.) Still, Plaintiff made two more reports of water leaking into the wall from her air handling unit. (*Id.* at 239–241.) She took a video of this occurrence and observed water flowing out of the wall. (*Id.* at 241; Pl. Ex. 31.) The court has inserted a screenshot from this video below for reference. While difficult to see because of the lighting, water is dripping from the bubble on the drywall.



(Pl. Ex. 31.)  On August 15, Sentinel maintenance personnel reported that the area was dry.  (Doc. 104 at 241–43.)  Two days later, Sentinel maintenance personnel were preparing to close the cut out in Plaintiff's drywall when they were instructed to stop by Plaintiff's attorney.  (Doc. 105 at 42–46.)  On August 21, Plaintiff vacated her unit.  (Doc. 105 at 98.)

This sequence of events demonstrates a more elongated timeline as compared to the leaks above Plaintiff's unit.  It is this timeline and Defendant's inconsistent responses that lead the court to conclude it violated the KRLTA.  Defendant was afforded ample opportunity to cure the problem (especially as it was aware of the leak from Plaintiff's apartment as early as June 2022),

yet failed to adequately do so.  This violates the KRLTA's requirement that landlords "maintain" certain appliances "in good and safe working order and condition."  K.S.A. § 58-2553(a)(3).

3.  *Damages*

Because Sentinel violated the KRLTA as codified at K.S.A. § 58-2553(a)(3), Plaintiff is entitled to recover damages.  K.S.A. § 58-2559(b).  Under the Act, the appropriate measure of actual damages is "the difference between the fair rental value of [Plaintiff's] apartment as it should have been and the fair rental value of the apartment as it actually was, insofar as the difference resulted from [Defendant's] breach of its statutory duties."  *Love*, 771 P.2d at 83 (modifications added).  Neither party has put forth any evidence from which the court can reliably ascertain what actual damages would be in this case.[2]  The court will not guess.  That means Plaintiff is entitled to $0 in actual damages.  But Plaintiff "is also entitled to any consequential damages flowing from [Defendant's] breach if such damages may fairly be considered as arising, in the usual course of things, from the breach itself, or may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach."  *Id.* (internal quotation marks omitted).

As consequential damages, Plaintiff may recover most of her claimed economic damages. The court determines that Plaintiff may recover the cost of her medical bill for a blood test because it was reasonable for her to be concerned about her health given the conditions in her unit. (*Compare* Doc. 60 at 14 *with* Doc. 104 at 262.)  Seeking appropriate medical care is unquestionably reasonable, foreseeable, and arises out Defendant's breach.  Plaintiff sought damages for this medical bill in the amount of $3,386.88.  (Pl. Ex. 97.)

---

[2] In fact, such damages are not even preserved in the pretrial order.  (*See* Doc. 60 at 14.)

Plaintiff also seeks consequential damages for medical bills relating to her two pets. (Doc. 69 at 14.)  Plaintiff may not recover these damages because the evidence shows that her dog had similar allergies the year prior.  (Doc. 105 at 22–24; Pl. Ex. 62.)  There is little to no evidence in the record concerning Plaintiff's cat's condition.  (*See* Docs. 102, 104, 105, 106; Pl. Ex. 58.)  As a result, the medical bills Plaintiff incurred for her pets cannot be "fairly considered as" flowing from Defendant's breach.  *Love*, 771 P.2d at 83.

Plaintiff's last claim for consequential are her "moving-related expenses." (Doc. 60 at 14.) The court will award damages for Plaintiff's U-Haul expenses, in the amount of $707.07.  (Pl. Ex. 99.)  But Plaintiff's claim for damages for increased rent and a security deposit at her new residence is rejected because Plaintiff admitted that her new residence is not comparable to her unit at Lexington Farms.  (Doc. 105 at 39.)  Plaintiff moved into a freestanding home with her then boyfriend, which is far different than the apartment she moved out of at Lexington Farms.  (*Id.* at 38.)  Accordingly, the court is unwilling to award damages based on the difference in rent or a security deposit.  Therefore, the clerk is directed to enter judgment for Plaintiff in the amount of $4,093.95 on count I.

### B. Breach of Contract

Because the provisions of the KRLTA are considered "incorporated into residential leases", Plaintiff's claim for breach of contract is duplicative of her KRLTA claim.  *See Jackson*, 726 P.2d at 800.  To prevail on the KRLTA claim is to prevail on the breach of the lease claim. Therefore, this claim is disposed of through the above analysis.  The clerk is directed to enter judgment for Plaintiff on count II.  Given that Plaintiff has recovered all the damages available to her through the KRLTA analysis above, she is not entitled to further damages on the breach of contract claim.

16

### C.  Negligence and Premises Liability

As Defendant argues, Plaintiff's claims for negligence and premises liability must fail. (Doc. 60 at 13.)  Plaintiff's tort claims are barred by the economic loss doctrine.  In Kansas, the economic loss doctrine bars tort claims when the duty Plaintiff claims was violated is duplicative of a duty that arises in contract.  *David v. Hett*, 270 P.3d 1102, 1114 (Kan. 2011).  To evaluate whether a claim sounds in tort or contract, a court must "examine[]" the "pleadings . . . to determine the nature of the duty alleged to have been breached. . . ."  *Id.*  The "nature and substance of the facts alleged" control the inquiry.  *Id.*  Merely because the parties have a contract however, does not mean that every claim arising from circumstances related to that contract arises in contract law. *Id.*  "Where a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of circumstances surrounding or attending the transaction, the breach of the duty is a tort."  *Id.* (cleaned up, internal quotation marks and citations omitted).

Because here, as in *Coker v. Siler*, 304 P.3d 689, 695–96 (Kan. Ct. App. 2013), there would be no duty of repair between the parties absent their contractual agreement (the lease), then Plaintiff's claim must sound in contract.  *See id.* at 695 ("Because there can be no implied warranty of workmanlike performance in the absence of an underlying agreement between the parties to provide services, we must now determine whether Coker and Chaney entered into such an agreement.").  This is true even when a statute creates the applicable duty.  Absent the contractual lease agreement Plaintiff signed with Defendant, the KRLTA and its duties would not apply to the parties.  Accordingly, there is no independent duty in law that applies to the parties, is relevant to the facts of this case, and would permit Plaintiff to raise concurrent tort claims.

But even if the economic loss doctrine did not apply, Plaintiff's tort claims still fail. Plaintiff concedes she suffered no personal property damage.  (Doc. 105 at 31–32.)  The court also

17

finds that she failed to produce evidence showing causation regarding personal injury; the court cannot conclude that any of her medical symptoms can be reliably attributed to exposure to mold in her apartment.  Plaintiff produced no evidence that conclusively ties her migraines, headaches, itchiness, or sinus congestion, to exposure to mold.  (*See* Doc. 104 at 253–54.)  As noted above, mostly excluded testimony from a treating functional medicine doctor, who saw Plaintiff in 2024, will not suffice.  The court is unwilling to cobble together circumstantial evidence to make a definitive conclusion about causation when common sense alone dictates Plaintiff's symptoms could be prompted by a range of possible causes.  This is particularly true when Plaintiff admitted to having similar symptoms two years after moving out of her Lexington Farms apartment.  (Doc. 105 at 10–11.)

Accordingly, the clerk is directed to enter judgment for Defendant on counts III and VI.

### D.    Punitive Damages

Plaintiff's punitive damages claim must also fail.  "Damages for breach of contract are limited to pecuniary losses sustained and exemplary or punitive damages are not recoverable in the absence of an independent tort."  *Guarantee Abstract & Title Co., Inc. v. Interstate Fire and Cas. Co., Inc.*, 652 P.2d 665, 667 (Kan. 1982) (citing *Temmen v. Kent-Brown Chev. Co.*, 605 P.2d 95 (1980)).  "This exception to the rule of unavailability of punitive damages in breach of contract actions is recognized when some independent tort or wrong results in additional injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer. In such a case the proof of the independent tort must indicate the presence of malice, fraud or wanton disregard for the rights of others."  *Id.*  In the specific context of a KRLTA claim, punitive damages are available and the standard is largely the same.  *Geiger v. Wallace*, 664 P.2d 846, 851 (Kan. 1983) (stating that when there is an independent tort which "results in additional injury and such

18

tortious act indicates malice, fraud or wanton disregard for the rights of others[]" then "nothing in the residential landlord and tenant act . . . precludes a tenant from recovering punitive damages in an appropriate case.").

Plaintiff has neither pled nor proved an independent tort. Accordingly, her punitive damages claim must fail. But even if the court were to construe her negligence/premises liability tort claims as independent of the lease agreement, the court is unconvinced that the facts of this case demonstrate the culpability required to support punitive damages. There is simply no evidence that Defendant acted with "wantonness and malice", *Geiger*, 664 P.2d at 851, even if Defendant did "drop[] the ball."[3] (Doc. 105 at 89.) Therefore, the clerk is directed to enter judgment for Defendant on count IX.

## III.    Conclusion

For the foregoing reasons, the clerk is directed to enter judgment for Plaintiff on counts I and II in the amount of $4,093.95, and enter judgment for Defendant on counts III, VI, and IX. IT IS SO ORDERED.  Dated this 16th day of July 2026.

s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Relatedly, any remaining request for noneconomic damages must also fail. (Doc. 60 at 14.) To recover damages for "pain, suffering, and mental anguish" a plaintiff must suffer some kind of accompanying physical injury. *Fusaro v. First Family Mortg. Corp., Inc.*, 897 P.2d 123, 131 (Kan. 1995) ("Generally, there can be no recovery for emotional distress caused by negligence unless accompanied by or resulting in physical injury. This rule does not apply where the injurious conduct was willful or wanton.") (internal citation omitted). As the court has explained, Plaintiff cannot establish causation for her claimed physical injuries and Defendant's conduct was not "willful or wanton." *Fusaro*, 897 P.2d at 131.